UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID APPLESTEIN, *et al.*, | No. C-10-0998 EMC |
| Plaintiffs, | **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT WITH LEAVE TO AMEND** |
| v. | |
| MEDIVATION, INC., *et al.*, | |
| Defendants. | **(Docket No. 113)** |

Lead Plaintiff Catoosa Fund LP (the "Fund") filed a securities class action against Defendants Medivation, Inc. and several of its senior officers, namely, David T. Hung, Patrick Machado, Lynn Seely, and Gregory Bailey. In its consolidated amended complaint ("CAC"), the Fund asserts that Defendants violated § 10(b) of the Securities Exchange Act and Rule 10b-5 by making false and misleading representations about the results of a clinical trial for a drug known as Dimebon. The Fund also claims that the individual defendants violated § 20(a) of the Securities Exchange Act based on their role as controlling persons within Medivation. Currently pending before the Court is Defendants' motion to dismiss. Defendants seek to dismiss both the § 10(b)/Rule 10b-5 and § 20(a) claims.

## I. FACTUAL & PROCEDURAL BACKGROUND

In the CAC, the Fund alleges as follows.

Dr. Hung and Mr. Machado co-founded Medivation as a privately held company in September 2003. *See* CAC ¶¶ 26, 20-21. In December 2004, Medivation entered into a reverse merger; that is, it merged with the existing subsidiary of a public company. *See id.* ¶ 17.

1    Prior to becoming a public company, Medivation purchased the rights to Dimebon, the
2 medication at issue. *See id.* ¶ 50. "In the early 1980s, Dimebon was used in Russia as an over-the-
3 counter oral antihistamine for treatment of allergies such as hay fever." *Id.* ¶ 2. However, "[i]n the
4 early 1990's, research began in Russia into whether there could be a link between Dimebon and
5 Alzheimer's disease." *Id.* ¶ 43. At some point, a clinical trial was done in Russia to assess
6 Dimebon's potential utility in treating Alzheimer's disease and other neurodegenerative disorders.
7 *See id.* ¶¶ 47-48. Dimebon passed this "Phase 1" study in 2001.[1] *See id.* ¶ 49.

8    There are three phases to human clinical trials. *See id.* ¶ 34. After Medivation acquired
9 Dimebon, it conducted a "Phase 2" Alzheimer's clinical trial for the drug. Like the Phase 1 study,
10 the Phase 2 study was also conducted in Russia. *See id.* ¶¶ 51-52. Apparently, this was because
11 Dimebon was not approved for sale in the United States by the Food and Drug Administration
12 ("FDA"). *See* CAC ¶¶ 3, 42.

13    According to the Fund, "only 33% of drugs are successful at Phase 2." *Id.* ¶ 4; *see also id.* ¶
14 37. Furthermore, "[a]pproximately 80% of drugs that enter Phase 3 clinical trials are eventually
15 approved." *Id.* ¶ 39. Thus, "if Phase 2 demonstrated Dimebon was an effective treatment for
16 Alzheimer's, the value of Medivation securities would rise tremendously [and] Medivation would be
17 an attractive candidate to lure funding from a large pharmaceutical company . . . ." *Id.*

18    "On September 21, 2006, the first day of the Class Period, [Medivation] announced that the
19 Phase 2 Study was a success. [Medivation] claimed that Dimebon met all efficacy endpoints in a
20 'randomized, double-blinded, placebo-controlled . . . clinical study . . . ." *Id.* ¶ 80. Medivation
21 repeated these claims at conferences, in press releases, and in public filings with the SEC. *See id.*
22 ¶¶ 86, 94 *et seq.*

23    As the Fund explains in the CAC, the claim that the Phase 2 study was double-blinded was
24 significant. In a clinical trial, some patients are given the active drug and some patients are given a
25 placebo. A placebo is a dummy treatment that appears as identical as possible to the test treatment

---

[1] "Phase 1 focuses on assessing the drug's safety in a group of healthy volunteers, usually at very small doses. These preliminary tests as used to determine whether small doses of the drug cause any immediate safety problems that could make continuation of the trial impossible." CAC ¶ 35.

with respect to physical characteristics such as color, weight, taste, and smell but that does not contain the test drug. *See id.* ¶ 56. Double-blinded means that neither the patients nor the investigators know which group of patients is receiving the active drug and which group is receiving the placebo. Tests are double-blinded to reduce error, self-deception, and bias. *See id.* ¶¶ 36, 53-54, 57.

According to the Fund, Medivation's claim that the Phase 2 study was double-blinded was false. In fact, the study was not double-blinded because the Dimebon pills did not have a coated capsule, which made them taste bitter and which made them have a numbing effect on the tongue. *See id.* ¶ 5, 62. This "unblinded" pill enabled the patients to infer that they were being given the active drug. Moreover, doctors and investigators were allegedly also unblinded as a result because the patients reported the bitter taste and numbing effect to them. *See id.* ¶ 5. The unblinding of the Phase 2 study caused false and misleading positive results for Dimebon. *See, e.g.*, *id.* ¶ 96.

In addition to the above, the Fund charges Medivation with making false and misleading statements by attributing Dimebon's success to a "novel mechanism of action" – *i.e.*, by boosting energy-producing cellular mitochondria. Id. ¶ 73. According to the Fund, these statements were false because Dimebon's alleged effect on mitochondria was based on flawed studies and disputed by members of the scientific community. See, *e.g.*, *id.* ¶ 143.

The Fund alleges that, after Medivation announced the success of the Phase 2 study on September 21, 2006 (the first day of the class period), its "stock surged to a 52-week high with a price increase of 38.84%." Id. ¶ 8. The Fund also maintains that, prior to the class period, the individuals had never made any sales of their Medivation stock but, after this announcement, the individual defendants began to sell their shares. During the class period, the individual defendants ended up selling shares resulting in proceeds of $22 million. *See id.* ¶¶ 175-76. In addition, "Medivation was able to enter into an agreement concerning Dimebon with Pfizer Inc., which gave Medivation an upfront cash payment of $225 million." *Id.* ¶ 8.

Meanwhile, the Phase 3 study for Dimebon (also known as the Connection study) began. According to the Fund, this time the clinical study, conducted largely in the United States, was truly double-blinded because the Dimebon pills were coated. *See id.* ¶¶ 89, 91.

3

On March 3, 2010, Medivation "announced that the double-blind Phase 3 test had failed miserably – patients treated with Dimebon had no statistically significant improvements . . . ." *Id.* at ¶¶ 92, 173. That same day, Medivation's stock "plummeted $27.15 per share from their Class Period high of $40.25 per share to close at $13.10 per share . . . – [a] one-day decline of 67% of volume of 45 million shares." *Id.* ¶ 172; *see also id.* ¶ 10. "Thus, in one day, investors who owned Medivation stock lost almost $1 billion." *Id.*

Based on the above allegations, the Fund has asserted two class claims: (1) a claim for securities fraud pursuant to § 10(b)/Rule 10b-5 and (2) a derivative claim under § 20(a) based on the individual defendants allegedly being controlling persons. Defendants seek dismissal of both claims.

## II. DISCUSSION

A. Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss based on the failure to state a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6). A motion to dismiss based on Rule 12(b)(6) challenges the legal sufficiency of the claims alleged. *See Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). In considering such a motion, a court must take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party, although "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal." *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). While "a complaint need not contain detailed factual allegations . . . it must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than sheer possibility that a defendant acted unlawfully." *Id.*

B.  Heightened Pleading Requirements under PSLRA

As noted above, the Fund has asserted two causes of action. The first is a claim for securities fraud pursuant to § 10(b) and Rule 10b-5. To state a claim under § 10(b) and Rule 10b-6, a plaintiff must allege: "(1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which [the plaintiff] relied (5) which proximately caused [the plaintiff's] injury." *Dsam Global Value Fund v. Altris Software*, 288 F.3d 385, 388 (9th Cir. 2002).

The second is a claim pursuant to § 20(a). A claim under this provision is essentially a derivative claim because to "prove a prima facie case under Section 20(a) [15 U.S.C. § 77t], [a] plaintiff must prove: (1) a primary violation of federal securities laws . . . and (2) . . . the defendant exercised actual power or control over the primary violator." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). In the instant case, the primary violation claimed is a violation of § 10(b) and Rule 10b-5. Thus, if, as Defendants argue, the Fund has not adequately pled a claim for securities fraud under § 10(b) and Rule 10b-6, then the § 20(a) claim must also fail as a result.

Under the Private Securities Litigation Reform Act ("PSLRA"), there are heightened pleading requirements where a claim for securities fraud is asserted. First, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Second, "the complaint shall . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" – here, scienter. *Id.* § 78u-4(b)(2).

In assessing whether there is a strong inference of scienter, a "court must determine whether 'all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009). Furthermore, in determining whether there is a strong inference of scienter, a

> "court must take into account plausible opposing inferences." This "inquiry is inherently comparative." A court must compare the malicious and innocent inferences cognizable from the facts pled in

> the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is *at least as compelling as* any opposing innocent inference.

*Id.* (emphasis added).

C.   Scienter

In the instant case, Defendants make multiple arguments as to how the Fund has failed to meet the PSLRA's heightened pleading requirements. The complaint appears to contain sufficient specificity to meet the threshold PSLRA pleading requirement. However, the critical issue is whether those specific facts are enough to give rise to a strong inference of scienter. Here, more than specificity is required; a court must examine the probative value of the allegations.

More specifically, per Ninth Circuit case law, this Court must first "determine whether any of the [Fund's] allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegations are sufficient, [the Court must] conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Id.* at 991-92.

In the instant case, the Fund contends that, particularly when its allegations are taken collectively and not individually, there is enough to support a strong inference of the requisite state of mind. The Fund highlights the following allegations from the CAC: Dimebon was at the time Medivation's most significant asset; Dimebon had not just positive results in the Phase 2 study but overwhelmingly positive results; after the Phase 2 results were announced, the individual defendants began for the first time to sell their shares of Medivation stock, resulting in $22 million in proceeds; after the Phase 2 results were announced, Medivation successfully entered into an agreement with Pfizer pursuant to which Pfizer gave Medivation an upfront cash payment of $225 million; when the positive Phase 2 results were formally published in *The Lancet*, the authors of the article, which included Dr. Hung and Dr. Seely, did not state that the Dimebon pills and the placebo were identical, as is standard practice; Defendants have never explained why the Phase 3 study failed so miserably when most drugs that pass Phase 2 also pass Phase 3; during a conference that took place shortly after the disappointing Phase 3 study results were announced, Dr. Hung and Dr. Seely admitted that the Dimebon pills had a bitter taste or numbing effect and the placebo did not; and during a

6

conference call that took place shortly after the disappointing Phase 3 study results were announced, Dr. Seely admitted that the Phase 3 Dimebon pills were coated, *i.e.*, to mask the bitter taste or numbing effect.

The above allegations can essentially be boiled down to the following: (1) the individual defendants knew that the Phase 2 study was not double blinded as claimed; (2) the individual defendants sold their Medivation stock knowing that the huge success of the Phase 2 study was because it had been unblinded; and (3) the individual defendants had a motive for falsifying the results of the Phase 2 study, namely, to obtain funding for Medivation. The Court finds that each of these allegations is not enough to give rise to a strong inference of scienter. Moreover, even collectively, the allegations are insufficient to meet this threshold.

1. <u>Unblinded Phase 2</u>

As noted above, the first of the Fund's primary contentions is that the individual defendants knew that the Phase 2 study was not double-blinded as claimed. The problem for the Fund is that the factual basis for this assertion – that the study was in fact not double-blinded – is weak, and, if the foundational fact of falsity is weak, then as a logical matter there cannot be a strong inference of scienter.[2]

In support of its assertion that the Phase 2 study was not double-blinded, the Fund essentially relies on the testimony of Dr. Lon S. Schneider. As reflected in the CAC, Dr. Schneider maintains that the Dimebon pills were not coated (and therefore had a bitter taste or numbing effect) based on

---

[2] In its CAC, the Fund actually claimed that Defendants made false and misleading statements in two ways: (1) by asserting that the Phase 2 study was double-blinded when, in fact, it was not; and (2) by attributing the success of Dimebon to an effect it had on mitochondria – a "novel mechanism of action." CAC ¶ 73. On the latter claim, the Court agrees with Defendants that they could not have made any false or misleading statements because, as pled in the CAC, it was a matter of scientific debate whether Dimebon had such an effect. *See Padnes v. Scios Nova Inc.*, No. C95-1693 MHP, 1996 WL 539711, at *5 (N.D. Cal. Sept. 18, 1996) (stating that, "where a company accurately reports the results of a scientific study, it is under no obligation to second-guess the methodology of that study").

In its papers, the Fund seems to recognize that the latter claim is weak based on *Padnes* and has articulated a new position – *i.e.*, that the fraud occurred because Defendants attributed the success of the Phase 2 study to the mitochondrial mechanism all the while knowing that the success actually resulted from the study not being double-blinded. *See* Opp'n at 23. To the extent this is the Fund's new theory, it is flawed because, as discussed *infra*, the factual basis for the claim that the study was not double-blinded is weak and, therefore, there cannot be a strong inference of scienter.

a conversation he had with a colleague who attended a health care conference held in Boston in March 2010, approximately a week after Medivation announced the disappointing Phase 3 study results. According to the Fund,

> [t]he attendee stated that Defendants Hung and Seely, after an oral slide presentation, were questioned by an analyst about whether the pills in the Phase 2 study were identical. Dr. Schneider's colleague stated that Defendants Hung and Seely admitted that the pills were not identical. . . . "Doctors Hung and Seely offered what many doctors in the field have long suspected – that the tablets were not identical in appearance and that Dimebon had a bitter or numbing taste, but the placebo did not."

CAC ¶ 68.

The problem with this allegation is that the unidentified colleague's statement lacks any corroboration, and therefore its reliability is highly questionable. As Defendants point out, if Dr. Hung and Dr. Seely did in fact make an admission at the conference that the Dimebon pills and placebo were not identical, then one would expect that information to have been publicized – at the very least in a report by the analyst who posed the question. *See* Mot. at 14; Reply at 3 n.3. As Defendants put it, "[i]t simply is not plausible that no one besides Plaintiff would have realized the impact of such an 'admission.'" Mot. at 14. That the colleague is not identified or described as a reliable source further compounds the problem. *Cf. In re Daou Sys.*, 411 F.3d 1006, 1015 (9th Cir. 2005) (noting that whether there is an adequate basis for a confidential witness's reliability depends on, *e.g.*, whether there is a probability that a person in the position of the confidential witness would possess the information alleged, the level of detail provided by the confidential source, and the corroborative nature of other facts alleged (including from other sources).

The Fund protests that there are in fact corroborating details, pointing to (1) the failure of the authors of *The Lancet* article, which included Dr. Hung and Dr. Seely, to describe the Dimebon pills used in the Phase 2 study or to say that they were identical to the placebo, which goes against standard practice, *see* CAC ¶ 67; (2) an article authored by Roy Jones (titled "Dimebon disappointment") which states that the Phase 2 Dimebon pills had a bitter taste and numbing effect; and (3) Dr. Seely's admission during a conference call (which took place shortly after the

8

1  disappointing Phase 3 study results were announced) that the Phase 3 Dimebon pills were coated,
2  *i.e.*, to mask the bitter taste or numbing effect. None of these arguments is availing.
3       First, as Defendants point out, *The Lancet* article, which published the results of the Phase 2
4  study, did include a statement that the Dimebon pills and placebo were identical – *i.e.*, they were
5  "matched." *See* Dunning Decl., Ex. 2, at 207, 209 (article from The Lancet) (making two references
6  to a "matched placebo").
7       Second, as Defendants further point out, Mr. Jones supported his statement that the Phase 2
8  Dimebon pills had a bitter taste and numbing effect by relying on another article, this one authored
9  by Susan Jeffrey. *See id.*, Ex. 21 (Jones article, footnote 8). Ms. Jeffrey in turn claimed that the
10 Dimebon pills had a bitter taste and numbing effect based on a statement by Dr. Schneider. *See id.*,
11 Ex. 22, at 3 (Jeffrey article). The problem here is obvious: Dr. Schneider can not corroborate
12 himself.[3]
13      Finally, contrary to what the Fund contends, Dr. Seely never made an admission during the
14 conference call at issue that the Phase 3 Dimebon pills were coated. As reflected in the transcript of
15 the call, Dr. Seely, she discussed *encapsulation* of the pills, not *coating*. Moreover, Dr. Seely
16 explained that the encapsulation of the Dimebon pills was for a different study, *i.e.*, the Huntington's
17 disease study and not the Phase 3 (Connection) study, and that the reason for the encapsulation was
18 to hide the dosage amount. Unlike the Huntington's disease study, the Phase 3 (Connection) study
19 never had encapsulated Dimebon pills. As Dr. Seely stated:

> The reason for [the over-encapsulation] was that we only had ten
> milligram capsules [of Dimebon] at the time. And when we were
> planning that [Huntington's disease] trial, we were planning to do two
> doses versus placebo. And so you always have to do manufacturing in
> advance, and we over-encapsulated the tablets to blind for dose. At

---

[3] In its opposition brief, the Fund tries to minimize this problem by arguing that

> [i]t is pure speculation for Defendants to assert that Dr. Jones
> "attributes" this fact *solely* to Susan Jeffrey's article. Anyone who has
> ever written an article with citations – or a judicial opinion – knows
> that the author does not include a citation to every source that supports
> his belief. The factual basis for Dr. Jones' belief will not be known
> until discovery.

Opp'n at 17 (emphasis added). This argument is without merit. It is even more speculative that Mr. Jones relied on other uncited authority.

> the end of the day, we only did the 20-milligram dose versus placebo, but that was the reason in that particular trial the tablets were encapsulated. It was to blind for dose.
>
> . . . .
>
> [B]y the time we did the CONNECTION [Phase 3] trial, we actually had now manufactured placebo, 5 milligram tablets and the 20-milligram tables that were identical, *so those were not over-encapsulated*.

Ottensoser Decl., Ex. A (Tr. at 4-5) (emphasis added). The reference to encapsulation appears to pertain to the size and dosage of the pills, not whether they were coated for taste.

In its papers, the Fund suggests that, even if Dr. Seely did not admit that the Phase 3 Dimebon pills were coated, the conference call is still corroborative evidence to the extent that Dr. Seely was responding to a question from an analyst about differences between the Phase 2 Dimebon pills and the Phase 3 Dimebon pills. According to the Fund, the analyst's understanding that the pills were different in the two phases "corroborates the information that Dr. Schneider's colleague reported from the . . . Conference." Opp'n at 13. The Fund's argument here is tenuous at best. As Defendants note, the analyst on the conference call did not specify where his understanding came from. Moreover, the analyst never indicated that it was his understanding that the Phase 2 pills were uncoated while the Phase 3 pills were coated. Nor did the analyst make reference to the Phase 2 pills being bitter in taste or having a numbing effect. Accordingly, given the – at best – weak corroborative nature of this evidence, the Fund's contention that the Phase 2 study was not double blinded has a weak factual basis and, as a result, a foundation for a strong inference of scienter of falsity is lacking.

2. <u>Insider Trading</u>

Assuming that there were persuasive allegations of falsity (*i.e.* that the study was not double-blinded), the Fund argues that the individual defendants' insider trading is indicative of scienter. An allegation of insider trading – while not required – can support the existence of scienter, but only where there is, in essence, unusual or suspicious stock sales. As the Ninth Circuit has stated, "[i]nsider trading is suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Ronconi v.*

*Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) (internal quotation marks omitted). The Ninth Circuit has "identified three relevant factors [with respect to scienter and insider trading]: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id.* (internal quotation marks omitted).

In the instant case, the timing of the sales by the individual defendants is arguably consistent with scienter. That is, as pled in the CAC, the individual defendants did not start to sell shares until after the positive results of the Phase 2 study were publicly announced on September 21, 2006. The fact that the sales were made pursuant to Rule 10b5-1 plans does not preclude a finding of fraud because, at the time the plans were adopted (in 2007 and on), the individual defendants were allegedly already aware of the unblinding. *See SEC v. Mozilo*, No. CV 09-3994-JFW (MANx), 2010 U.S. Dist. LEXIS 9820, at *65 (S.D. Cal. Sept. 16, 2010) (stating that "the SEC has raised genuine issues of material fact that Mozilo was aware of material, non-public information at the time he adopted or amended these trading plans and that he acted with scienter"); *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 200 (S.D.N.Y. 2010) (noting that "here it is alleged that Defendants were already aware of the Company's mortgage exposure time bombs at the time Simmons and Webb adopted their trading plans"); *In re NutriSystem, Inc. Secs. Litig.*, 653 F. Supp. 2d 563, 576 (E.D. Pa. 2009) (noting that "[a] Rule 10b5-1 plan prearranges stock transactions and provides an affirmative defense to an allegation of insider trading, provided the plan is adopted in writing prior to becoming aware of material non-public information"). On the other hand, the individual defendants did not start to sell stock immediately after the announcement on September 21, 2006, which one might expect them to have done given that this was the first news of the positive Phase 2 study. *See* CAC ¶ 175 (alleging first sale by Mr. Bailey on July 18, 2008; first sale by Dr. Hung on March 16, 2007; first sale by Mr. Machado on March 16, 2007; and first sale by Dr. Seely on March 16, 2007).

As for the individual defendants' prior trading history, arguably this is consistent with scienter as well. As alleged in the CAC, no sales were made by the individual defendants prior to the public announcement of the Phase 2 success on September 21, 2006. *See* CAC ¶ 176. In their papers, Defendants argue that the individual defendants' failure to sell prior to September 21, 2006,

11

is justified. More specifically, they claim that the individual defendants were not able to sell until after March 8, 2007, because Medivation's stock was not listed on NASDAQ until after that date. *See* Mot. at 24 n.23; *cf. Ronconi*, 253 F.3d at 436 (noting that "the seven month trading period prior to the class period offered by plaintiffs to prove the defendants['] pattern of trading does not prove much about their trading habits, since they were not able to trade during some or much of that time under SEC regulations"). But as the Fund points out, the individual defendants "could have sold the stock prior to [March 8, 2007,] on the American Stock Exchange . . . or Over-the-Counter Bulletin Board . . . ." Opp'n at 7 n.3; *see also* CAC ¶ 18 (alleging that, when Medivation merged with a public company, its stock could be "publicly traded on the Over-the-Counter Bulletin Board"; also alleging that, "[o]n March 8, 2006, Medivation's common stock was approved for listing on the American Stock Exchange").

The problem for the Fund is that, even though the two factors above are arguably consistent with scienter, the first *Ronconi* factor weighs heavily against that level of intent. In the CAC, the Fund alleges that the individual defendants sold almost 1 million shares of stock while in possession of the materially adverse inside information (*i.e.*, that the Phase 2 study was not double-blinded), resulting in proceeds of approximately $22 million. *See* CAC ¶ 175. But as Defendants point out in their papers (and the Fund does not contest), three out of the four individual defendants (*i.e.*, Dr. Hung, Mr. Machado, and Dr. Seely) actually held *more* stock in Medivation at the end of the class period than they did at the beginning because they accumulated vested options – and thus lost more than $82 million.[4] *See* Mot. at 22. In short, they maintained more stock than they sold during the class period. This fact strongly rebuts an inference of scienter on the part of these individual defendants. Indeed, in *Silicon Graphics*, the Ninth Circuit rejected a strong inference of scienter where, "[c]ollectively, the officers – even including the two who sold the greatest percentage of their holdings – retained 90 percent of their available holdings." *Silicon Graphics*, 183 F.3d at 986; *see*

---

[4] Per Ninth Circuit authority, the vested options should be considered. *See In re Silicon Graphics Secs. Litig.*, 183 F.3d 970, 986-87 (9th Cir. 1999) (stating that "we see no reason to distinguish vested stock options from shares because vested stock options can be converted easily to shares and sold immediately[;] [a]ctual stock shares plus exercisable stock options represent the owner's trading potential more accurately than the stock shares alone" and "therefore, a sale involving a significant portion of an insider's actual shares, but only a small portion of his shares and options combined, is less suspicious than were the insider to hold no options").

1 *also In re Pixar Secs. Litig.*, 450 F. Supp. 2d 1096, 1105-06 (N.D. Cal. 2006) (White, J.) (noting that insiders' retention of over 99% of their total holdings "undermine[d] any inference of scienter"); *In re FVC.com Secs. Litig.*, 136 F. Supp. 2d 1031, 1038-39 (N.D. Cal. 2000) (Breyer, J.) (concluding stock sales were not sufficiently suspicious where "the defendants retained over 86% of their exercisable stock shares" and "all insiders (officers and directors) retained over 90% of their stock holdings"); *cf. In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1118 (9th Cir. 1989) (noting that "defendants retained the great bulk of their Apple holdings, and held on in the face of a decline in value of almost 75% following disclosure of Lisa's disappointing sales"), *overruled on other grounds as stated in McGuire v. Dendreon Corp.*, 688 F. Supp. 2d 1239 (W.D. Wash. 2009).

Admittedly, one of the individual defendants, Mr. Bailey, did hold less stock at the end of the class period than he did at the beginning. More specifically, based on Defendants' chart, it appears that Mr. Bailey sold approximately 38% of his holdings (*i.e.*, 259,000/674,649). *See* Mot. at 22. In *Metzler Investment GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049 (9th Cir. 2008), the Ninth Circuit indicated that sales amounts larger than 37% would be needed to support a strong inference of scienter. *See id.* at 1067 (noting that one individual defendant made no sales during the class period and another only 37%; adding that "[w]e typically require larger sales amounts – and corroborative sales by other defendants – to allow insider trading to support scienter"). Because here Mr. Bailey sold slightly more – 38% – an argument could be made that a strong inference of scienter is possible as to him. At the end the day, however, this fact still is not enough to support a strong inference of scienter. This is because, in *Silicon Graphics*, the Ninth Circuit concluded that an insider's sales of *43.6%* of his holdings did not give rise to a strong inference of scienter, either on his part or on the part of the other insiders, because his sales comprised only 5% of *total* insider sales. *See Silicon Graphics*, 183 F.3d at 987. Based on Defendants' chart, Mr. Bailey's sales accounted for only 6-7% of total insider sales (*i.e.*, 259,000/3,956,043), and therefore *Silicon Graphics* dictates that there is no strong inference of scienter. Moreover, there is nothing in the CAC which suggests that Mr. Bailey was in a different position than the other three other individual defendants. The fact that three out of the four kept the vast majority of their stock during the class

13

1 period as well as the fact that, viewed in the aggregate, so did these four defendants tends to negate a
2 strong inference of scienter here.

3 Finally, the authority relied on by the Fund, *i.e.*, *Nursing Home Pension Fund, Local 144 v.*
4 *Oracle Corp.*, 380 F.3d 1226 (9th Cir. 2004), does not alter the above analysis. In *Nursing Home*,
5 the Ninth Circuit noted that, even though Larry Ellison had sold only 2.1% of his holdings, that did
6 not preclude a strong inference of scienter because that sale amounted to a sale of $900 million
7 worth of stock – and in a span of less than ten days. The court noted that, "where, as here, stock
8 sales result in a truly astronomical figure, less weight should be given to the fact that they may
9 represent a small portion of the defendant's holdings." *Id.* at 1232. In the instant case, the $22
10 million in sales – although not insignificant – pales in comparison to the $900 million in sales in
11 *Nursing Home*. *Compare also In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044,
12 1069 (C.D. Cal. 2008) (noting that "[i]t is irrelevant that Mozilo held on to over 7 million shares of
13 Countrywide stock through the end of 2007, even as the market was falling" because, "[o]ver the
14 Relevant Period, Mozilo received $474.49 million in stock proceeds"). Furthermore, there was not
15 an astronomical number of shares sold in a short period of time. Finally, in the case at bar, in spite
16 of the $22 million gained, the individual defendants also sustained losses that far exceeded the gains
17 – *i.e.*, $82 million.

18     3.     <u>Motive</u>

19 Finally, the Fund contends that Defendants' motive to get funding for Medivation is also
20 indicative of scienter. In their papers, Defendants charge that this assertion is essentially foreclosed
21 by *Lipton v. Pathogenists Corp.*, 284 F.3d 1027 (9th Cir. 2002). There, the Ninth Circuit noted as
22 follows:

> Plaintiffs allege that PathoGenesis concealed knowledge of flat patient demand to enhance opportunity (1) to secure a line of credit from its lender and (2) to gain regulatory approval abroad. These generalized assertions of motive, without more, are inadequate to meet the heightened pleading requirements of *Silicon Graphics*.
>
> If scienter could be pleaded merely by alleging that officers and directors possess motive and opportunity to enhance a company's business prospects, "virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." Patho-Genesis' alleged desires to obtain

> favorable financing and to expand abroad are in themselves ordinary and appropriate corporate objectives. Such routine business objectives, without more, cannot normally be alleged to be motivations for fraud. To hold otherwise would be to support a finding of fraudulent intent for all companies that plan to lower costs and expand sales.

*Id.* at 1038.

Defendants correctly argue that *Lipton* supports their position. Moreover, *Silicon Graphics*, on which the *Lipton* court relied, strengthens Defendants' position even more. In *Silicon Graphics*, the Ninth Circuit held that "a private securities plaintiff proceeding under the PSLRA must plead, *in great detail*, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *Silicon Graphics*, 183 F.3d at 974 (emphasis added). It then emphasized:

> [A]lthough facts showing mere recklessness or a motive to commit fraud and opportunity to do so may provide *some* reasonable inference of intent, *they are not sufficient to establish a strong inference of deliberate recklessness*. In order to show a strong inference of deliberate recklessness, plaintiffs must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity. Accordingly, we hold that particular facts giving rise to a strong inference of deliberate recklessness, at a minimum, is required to satisfy the heightened pleading standard under the PSLRA.

*Id.* (emphasis added).

In light of *Lipton* and *Silicon Graphics*, Defendants' motive is inadequate to support a strong inference of scienter.

### 4. Collective Allegations

As discussed above, each of the Fund's allegations on its own is not enough to give rise to a strong inference of scienter. Furthermore, even taking the allegations collectively or holistically, the Court concludes that the Fund still has not shown that a "malicious inference is at least as compelling as any opposing innocent inference." *Zucco*, 552 F.3d at 991. Indeed, the story painted by the Fund makes the innocent inference significantly more compelling. In particular, if, as the Fund charges, the individual defendants – particularly those with medical degrees – knew that the magnitude of the Phase 2 success was due to an unblinding of the study, then one would have expected them to have sold far more stock than they did. Even if the individual defendants wanted to hedge their bets, they would have known that the Phase 3 study would be a colossal failure and so at the very least there was no incentive to hold more stock at the end of the class period (as three of

them did) than they did at the beginning. The thin allegations of falsity combined with the facts regarding the relatively low percentage of stock sold by the individual defendants negate a strong inference of scienter.

### III. CONCLUSION

Because the Court finds that the Fund has failed to plead allegations giving rise to a strong inference of scienter as required by the PSLRA, it dismisses both the § 10(b)/Rule 10b-5 claim and the derivative § 20(a) claim. The dismissal, however, shall be without prejudice as, at this juncture of the proceedings, the Court cannot say that the claims could not be cured by the allegation of other facts. *See Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).

Accordingly, the Fund shall have thirty days from the date of this order to file an amended complaint that addresses the above deficiencies. The Fund is permitted to plead only additional factual allegations; it is not to add new claims for relief. Within thirty days of the filing and service of the amended complaint, Defendants shall respond to the amended complaint.

Finally, a further status conference in this case shall be held on December 2, 2011, at 9:00 a.m. A week before the conference, the parties shall file a joint status conference statement.

This order disposes of Docket No. 113.

IT IS SO ORDERED.

Dated: August 18, 2011

_____
EDWARD M. CHEN
United States District Judge